**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| BRENTON WAYNE TROTTER, an individual and DOORTEC, LLC, an Oklahoma Limited Liability Company, f/k/a TROTTER DOORS, LLC, an Oklahoma limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>AMERICAN MODERN SELECT INSURANCE COMPANY, a corporation,<br><br>Defendant. | Case No.: 5:15-cv-00024-L |

**AMERICAN MODERN SELECT INSURANCE COMPANY'S MOTION FOR**
**SUMMARY JUDGMENT AND BRIEF IN SUPPORT**

## TABLE OF CONTENTS

I.    STATEMENT OF MATERIAL FACTS TO WHICH NO GENUINE
      DISPUTE EXISTS.................................................................................. 1

      A.    The Trotter Family Dispute and Filing of the Underlying Lawsuit.............. 1

      B.    Trotter Doors Tenders Underlying Lawsuit to American Modern, Who
            Agrees to Defend Under A Reservation of Rights........................................ 3

      C.    American Modern Hired Mr. Trotter's Chosen Counsel to Vigorously
            Defend the Lawsuit ................................................................................... 4

      D.    The August 2013 Mediation and Lone Demand to Settle the Case ............. 7

      E.    The October Judicial Settlement Conference and Settlement of the
            Underlying Case. ....................................................................................... 9

      F.    The Parties in the Underlying Lawsuit Negotiate a Settlement Agreement,
            Excluding American Modern From Participating....................................... 13

      G.    Trotter Doors v. American Modern Lawsuit............................................... 15

      H.    American Modern's Policy ....................................................................... 15

II.   LEGAL STANDARD........................................................................................ 16

III.  ARGUMENT AND CITATION OF AUTHORITY ......................................... 17

      A.    Trotter Doors Cannot Meet Its Burdon of Proof that American Modern
            Breached the Policy ................................................................................. 19

            1.    The Underlying Lawsuit Sought Both Covered and Non-Covered
                  Claims............................................................................................ 21

            2.    American Modern Met Its Duty to Defend .................................... 27

            3.    American Modern Has No Duty to Indemnify Trotter Doors for Its
                  Voluntary Payment to Settle the Underlying Case ........................ 27

                  a.    Trotter Doors' May Not Recover Its Voluntary Payment ..... 28

                  b.    Trotter Doors' Lawsuit Is Barred by the Policy's Legal
                        Action Against Us Provision ................................................ 32

      B.    Equity Further Bars Trotter Doors' Attempt to Recover the $275,000 it Paid
            to Acquire the Branding Terms and/or for Non-Covered Claims.............. 35

      C.    American Modern's Reliance on Mr. Ozinga's Expertise and Valuation of
            the Case is Not Bad Faith......................................................................... 37

IV.   CONCLUSION ................................................................................................. 41

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) ........................................................ 16

*Automax Hyundai S., L.L.C. v. Zurich Am. Ins. Co.*, 720 F.3d 798, 806 (10th Cir. 2013) ..... 27, 35

*Badillo v. MidCentury Ins. Co.*, 121 P.3d 1080, 1093 (Okla. 2005) ............................................ 38

*Boggs v. Great N. Ins. Co.*, 659 F. Supp. 2d 1199, 1204 (N.D. Okla. 2009) ........................... 16, 17

*Carpet City, Inc. v. Carpet Land, Inc.*, 335 P.2d 355, 358 (Okla. 1958) ..................................... 26

*Caton v. State Farm Fire & Cas. Co.*, No. CIV-06-1112-F, 2007 WL 2993869, at \*5 (W.D. Okla. Sept. 19, 2007) ........................................................................................................ 33

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986) ............................................................... 16

*Christian v. Am. Home Assur. Co.*, 577 P.2d 899 (Okla. 1978) .................................................... 38

*Coalgate Abstract Co. v. Coal County Abstract Co.*, 67 P.2d 37, 40 (1937) .............................. 26

*First Bank of Turley v. Fidel and Deposit Ins. Co.*, 928 P.2d 298, 302-03 (Okla. 1996). 20, 21, 27

*French v. Assurance Co. of Am.*, No. 1:04CV550 JCC, 2006 WL 2975651, at \*3 (E.D. Va. Oct. 16, 2006) ............................................................................................................... 34

*Gay & Taylor, Inc. v. St. Paul Fire & Marine Ins. Co.*, 550 F. Supp. 710, 716 (W.D. Okla. 1981) ................................................................................................................................ 35, 37

*Hayes v. State Farm Fire & Cas. Co.*, 855 F. Supp. 2d 1291, 1301 (W.D. Okla. 2012) ............ 33

*Higgins v. Allstate Indemnity Company*, No. CIV-14-959-R, 2015 WL 7458647 at \*3 (W.D. Okla. Nov. 23, 2015) (unpublished) .......................................................................... 20

*Houston Gen. Ins. Co. v. Am. Fence Co., Inc.*, 115 F.3d 805, 806 (10th Cir. 1997) (applying Oklahoma insurance law) ................................................................................................... 20

*Kendall v. Watkins,* 998 F.2d 848, 850 (10th Cir. 1993) .............................................................. 16

*KY II Realtors v. Dips Pest Control Serv.*, No. 3:08-CV-1135-K, 2009 WL 1532061 (N.D. Tex. June 1, 2009) ..................................................................................................................... 34

*Low v. Golden Eagle Ins. Co.*, 110 Cal. App. 4th 1532, 1544-46 (2003) ..................................... 29

*Max True Plastering Co. v. U.S. Fid. and Guar. Co.*, 912 P.2d 861, 869 (Okla. 1996).............. 20

*McMahon v. Med. Protective Co.*, 92 F. Supp. 2d 367, 376-78 (W.D. Pa. 2015)...... 28, 29, 30, 31

*Milroy v. Allstate Ins. Co.*, 151 P.3d 922, 927 (Okla. Civ. App. 2007)....................................... 39

*Missouri Prof'l Liab. Ins. Ass'n v. Am. Cas. Co. of Reading, Pennsylvania*, 760 F. Supp. 783
(W.D. Mo. 1991).............................................................................................................. 34

*Christian v. Am. Home Assur. Co.*, 577 P.2d 899 (Okla. 1978) .................................................. 38

*Pitman v. Blue Cross and Blue Shield of Okla.*, 217 F.3d 1291, 1298 (10th Cir. 2000) ............. 20

*Scottsdale Ins. Co. v. Owl Nite Sec., Inc.*, No. 06–CV–0097–CVE–SAJ, 2006 WL 3742102
(N.D. Okla. Dec. 15, 2006) (unpublished)...................................................................... 20

*Sellman v. Amex Assur. Co.*, No. 05-CV-545 GKFPJC, 2007 WL 1072210, at *1-3 (N.D. Okla.
Apr. 4, 2007), *aff'd*, 274 F. App'x 655 (10th Cir. 2008); ......................................... 39

*Southern Guaranty Ins. Co. v. Dowse*, 278 Ga. 674, 605 S.E.2d 27 (2004) ............................... 33

*Southern Hospitality, Inc. v. Zurich Am. Ins. Co.*, 393 F.3d 1137, 1142 (10th Cir. 2004)........... 38

*Thompson v. Haynes*, 305 F.3d 1369, 1378 (Fed. Cir. 2002) ...................................................... 25

*Timberlake Const. Co. v. U.S. Fid. & Guar. Co.*, 71 F.3d 335, 340-41 (10th Cir. 1995) ............ 39

*Travelers Ins. Co. v. Maplehurst Farms, Inc.,* 953 N.E.2d 1153, 1161 (Ind. Ct. App. 2011)...... 29

*Trinity Outdoor, LLC v. Central Mut. Ins. Co.*, 285 Ga. 583, 586 (2009).................. 29,30, 33, 34

*Trotter Overhead Door, Inc. v. Trotter Doors, LLC*, No. CIV–11–1348–HE, 2013 WL 3283346
at *5 (W.D. Okla. June 23, 2013) ................................................................................. 26

*U.S. Fid. and Guar. Co. v. Briscoe*, 239 P.2d 754, 756 (Okla. 1952) ....................................... 20

*VBF, Inc. v. Chubb Group of Ins. Cos.*, 263 F.3d 1226 (10th Cir. 2001) .......................... 21

*W. Bend Mut. Ins. Co. v. Arbor Homes LLC*, 703 F.3d 1092, 1096-97 (7th Cir. 2013).............. 29

*Western Diversified Servs., Inc. v. Hyundai Motor America, Inc.*, 427 F.3d 1269, 1273 (10th Cir.
2005) .............................................................................................................................. 24

**Statutes**

15 U.S.C. § 1125(d)(1)(A) ........................................................................................ 26

Anticybersquatting Consumer Protection Act ................................................... 22, 26

Lanham Act, 15 USC § 1125(a) ............................................................................. 21

Oklahoma Deceptive Trade Practices Act ........................................................... 22, 25

Oklahoma Unfair Claims Settlement Practices Act ............................................... 38

Oklahoma's Common Law for Unfair Competition and Trademark Infringement ..................... 22

**Rules**

Federal Rule of Civil Procedure Rule 56 ............................................................... 16

Local Rule 7.1(n) ..................................................................................................... 2

American Modern Select Insurance Company ("American Modern") submits this, its Motion for Summary Judgment and Brief in Support, showing the Court as follows:

## I.   STATEMENT OF MATERIAL FACTS TO WHICH NO GENUINE DISPUTE EXISTS

### A.   The Trotter Family Dispute and Filing of the Underlying Lawsuit

1.   The lawsuit underlying this insurance coverage dispute arose out of a family dispute over the use of the name Trotter, logos, advertising slogans, and various domain names, with respect to a well-known Oklahoma garage door business. *See* Underlying Complaint, attached as Exhibit 1.

2.   Trotter Doors, LLC is a company that sells and services automatic garage door products, and was formed in 2009 by Brenton Trotter (collectively "Trotter Doors"[1]). *Id.* at ¶ 10.

3.   Brenton Trotter previously worked for Trotter Overhead Door, Inc., which was owned by his uncle, Jessie Trotter (collectively "TOD"). *Id.* at ¶¶ 8, 10.

4.   The Trotter family has been in the automatic garage door business since 1964 and was originally started by Brenton Trotter's grandparents/ Jesse Trotter's parents. This business was officially formed as Automatic Garage Door, Inc., but frequently advertised and was known throughout Oklahoma as "Trotter Automatic Garage Door" and "Trotter

---

[1] During this brief, American Modern refers to Trotter Doors and Brenton Trotter, in his capacity as manager and member of Trotter Doors, collectively as "Trotter Doors." When referring only to Brenton Trotter, American Modern will use Mr. Trotter.

Overhead Garage Door of Oklahoma City." *See* Transcript of Brenton Trotter, at pp. 16:12-15, 24:7-23, attached as Exhibit 2.[2]

5.   In 1987, TOD, through its principal, Jesse Trotter, gave his parents an oral license to use the name "Trotter Overhead Door", the name Jesse first used in an incorporated business.   Underlying Complaint, Ex. 1, at ¶ 9; Trotter Depo., Ex. 2, at p. 23:13-20.

6.   Jesse Trotter claims he revoked the oral license in 2007, resulting in the reversion to use of a former business name, Automatic Garage Door. Underlying Complaint, Ex. 1, at ¶ 9.

7.   In 2009, Brenton Trotter purchased his grandparents' business and changed the name to Trotter Doors. Trotter Depo., Ex. 2, at p. 26:3-17.

8.   Brenton Trotter operated the business as Trotter Doors, and registered nearly twenty (20) domain names that used various iterations of "Trotter Doors" or "Trotter Overhead Doors" in connection with his business. Underlying Complaint, Ex. 1, at ¶ 13; Trotter Depo., Ex. 2, at pp. 30-39.

9.   The two family businesses became competitors and disputes began to arise over the use of the Trotter family name, advertising slogans, and the use of the Trotter family horse logo ("Branding Terms"), which had become synonymous with the automatic garage door business in Oklahoma. *See generally* Underlying Complaint, Ex. 1.

---

[2] Per Local Rule 7.1(n), American Modern attaches only excerpts of the various deposition transcripts cited that are relevant to the matter under consideration. American Modern will produce a full copy of the deposition transcripts upon the Court's request.

10. In September 2011, TOD sent a cease and desist letter to Trotter Doors regarding the use of the "Trotter" name in connection with its automatic garage door business and demanded the domain names be transferred to TOD. *Id.* at ¶ 14.

11. Trotter Doors retained Martin Ozinga, a trademark and intellectual property lawyer in Oklahoma City, to handle its defense. Trotter Depo., Ex. 2, at p. 46:13-23.

12. Trotter Doors agreed to turn over nine (9) of the disputed domain names, but refused to stop using the Trotter name. *Id.* at pp. 48:21-24, 49:6-8.

13. TOD and Jesse Trotter filed suit against Trotter Doors and Brent Trotter in this District seeking injunctive relief and damages for trademark infringement and cybersquatting under federal law, and for liability under the Oklahoma Deceptive Trade Practices Act and common law (the "Underlying Lawsuit"). *See* Underlying Complaint, Ex. 1.

14. Further, TOD alleged that Trotter Doors and Mr. Trotter acted in bad faith, and with a willful intent to harm TOD and divert customers, such that TOD was entitled to triple damages and attorneys' fees. *Id.*

15. Mr. Trotter was sued individually with respect to his alleged conduct and duties as a manager and member of Trotter Doors. *Id.*

**B.    Trotter Doors Tenders Underlying Lawsuit to American Modern, Who Agrees to Defend Under A Reservation of Rights.**

16. After hiring Mr. Ozinga, Trotter Doors tendered the Underlying Lawsuit to American Modern, who had insured Trotter Doors under a series of commercial general

liability policies, beginning with Policy No. Q61016847, for the policy period April 9, 2009 through April 9, 2010 (the "Policy"), attached as Exhibit 3.

17. Due to the unique nature of the trademark infringement claims against its insured, American Modern retained Robert Hayden to provide a coverage analysis regarding its obligations under the Policy. *See* Coverage Opinion dated January 15, 2012, attached as Exhibit 4.

18. Mr. Hayden opined that some of the claims may be covered under the Policy, while others were not, but that American Modern should defend Trotter Doors. *Id.*

19. Therefore, based on Mr. Hayden's opinion, American Modern agreed to defend Trotter Doors and Mr. Trotter, in his managerial capacity, subject to a reservation of rights. *See* Reservation of Rights letter, attached as Exhibit 5.

### C. American Modern Hired Mr. Trotter's Chosen Counsel to Vigorously Defend the Lawsuit

20. As Trotter Doors had already hired Mr. Ozinga, an experienced trademark and intellectual property attorney, American Modern agreed for Mr. Ozinga to continue the defense, which is what Mr. Trotter wanted. *See* Retention Email, attached as Exhibit 6; *see* Trotter Depo., Ex. 2, at p. 59:24; Deposition of Jennifer Miller (formally Ventura), at p. 24:16-19, attached as Exhibit 7.

21. American Modern provided a full defense to Trotter Doors, despite the fact that the Branding Terms had to be worked out before the monetary portion of the settlement could be discussed. *See* July 3, 2013 Email, attached as Exhibit 8; Trotter Depo., Ex. 2, at pp. 60:3-7, 69:5-13, 70:12-16.

22.  American Modern paid Mr. Ozinga to facilitate the negotiation of the Branding Terms, which was the lynchpin of any resolution of the dispute as Mr. Trotter was initially unwilling to part with the Trotter name. *Id.* Deposition of Martin Ozinga, at. pp. 22-24, attached as Exhibit 9.

23. American Modern gave Mr. Ozinga full control over the defense of the Underlying Lawsuit, including the retention of experts. *See* Expert Retention Email, attached as Exhibit 10; Miller Depo., Ex. 7, at p. 153:9-15.

24. American Modern, through its defense adjuster Linda Wood, continuously requested updates on the status of the Underlying Lawsuit, as well as an analysis of the potential value of the case. *See* October 8, 2013 Email, January 23, 2013 Email, January 29, 2013 Email, March 21, 2013 Email, and April 25, 2013 Email ("Status Update Emails"), collectively attached as Exhibit 11; July 3, 2013 Email, Ex. 8;  Deposition of Linda Wood, at pp. 233:18-21, 281:9-11, attached as Exhibit 12.

25. Mr. Ozinga advised American Modern that the potential damages were minimal, as this was a family dispute, and that no real money would ever change hands. He continuously told American Modern that the probable jury verdict was less than $100,000. *See* Status Update Emails, Ex. 11; Ozinga Depo., Ex. 9, at pp. 102:22-25 – 103:1-2, 115:1-11, 201:9-12; Wood Depo., Ex. 12, at p. 278:22-24; *see* November 21, 2012 Mediation Statement, attached as Exhibit 13.

26. Mr. Ozinga also repeatedly advised American Modern that the Underlying Lawsuit was defensible. *See* Status Update Emails, Ex. 11; Ozinga Depo., Ex. 9, at p. 28:15-22.

27. American Modern relied on the advice and expertise of Mr. Ozinga. *See* Miller Depo., Ex. 7, at p. 12:8-13; Ozinga Depo., Ex. 9, at p. 126:15-21; Wood Depo., Ex. 12, at pp. 145:21-23, 157:20-24, 279:10-18.

28. Specifically, American Modern relied on Mr. Ozinga to provide his valuation of Trotter Doors' potential exposure to damages. Wood Depo., Ex. 12, at p. 211:7-9; Deposition of Ressie Ragland, at p. 242:6-8, attached as Exhibit 14.

29. The parties' damage experts provided wildly different estimates: TOD's expert estimated over $3,000,000 in damages, and $1,900,000 in statutory penalties, and Trotter Doors' expert put a $74,000 value on the potential damages. *See* Supplemental Report of D.R. Harris, attached as Exhibit 15; Report of Mike Deeba, attached as Exhibit 16.

30. Considering the expert's opinions and all discovery conducted in the case, Mr. Ozinga continued to advise American Modern that the jury verdict would likely be less than $100,000. Ozinga Depo., Ex. 9, at p. 267:9-13; Deposition of Jared Lamb, at pp. 152:21-25 – 153:1-2, attached as Exhibit 17; Deposition of Steve Sensibar, at p. 103:2-3, attached as Exhibit 18.

31. Following discovery, both parties submitted motions for summary judgment, which were denied. *See* Order, attached as Exhibit 19.

32. Following the summary judgment Order, Mr. Ozinga's opinion and valuation of the case did not change.  Wood Depo., Ex. 12, at p. 165:19-20.

33. Mr. Ozinga testified that for the first year and a half of the litigation, all American Modern could do was pay him to defend the case, as Mr. Trotter was unwilling to relinquish using the Trotter Doors name.   Until the Branding Terms were resolved, there

could be no discussion of a monetary settlement in which American Modern could contribute. Ozinga Depo., Ex. 9, at pp. 80:20-24, 161:9-19; Wood Depo., Ex. 12, at p. 115:1-22; *see* August 9, 2013 Mediation Statement, attached as Exhibit 20.

34. Mr. Ozinga testified that the Branding Terms were very important to Mr. Trotter's business going forward, and the use of the Trotter name in some form, the "since 1964" advertising slogan, the Trotter horse logo, and certain domain names were worth at least $500,000 to Mr. Trotter's ongoing business, if he were to decide to change his name. Ozinga Depo., Ex. 9, at pp. 153:18-25 – 154:1-4.

### D.   The August 2013 Mediation and Lone Demand to Settle the Case

35. Following the end of discovery and denial of the parties' competing summary judgment motions, the parties mediated in August, 2013. Despite his $100,000 valuation, Mr. Ozinga believed that $250,000 was the magic number needed to settle the case. *See* August 13, 2013 Report, attached as Exhibit 21; Ozinga Depo., Ex. 9, pp. 147:24-25 – 148:1-4.

36. At the August mediation, Mr. Trotter finally decided to changes his business name and came to an informal agreement concerning the Branding Terms that Mr. Ozinga testified were favorable to Mr. Trotter's business going forward. Ozinga Depo., Ex. 9, at p. 182:14-22. TOD, however, demanded $750,000 to make these concessions and settle the case. *See* August 21, 2013 Email, attached as Exhibit 22.

37. Mr. Ozinga, on behalf of Trotter Doors, then demanded American Modern pay the entire $750,000, and threatened bad faith. A response was required by August 23, 2013.

This is the only formal demand American Modern ever received. *See* August 21, 2013 Demand Letter, attached as Exhibit 23.

38.  American Modern rejected the demand based on Mr. Ozinga's evaluation of the case and opinion that the probable jury verdict was still less than $100,000, despite his demand that American Modern pay TOD's $750,000 demand. *See* August 21, 2013 Email, attached as Exhibit 24; Wood Depo., Ex. 12, at pp. 86:11-17, 177:17-25 – 178:1-5; Sensibar Depo., Ex. 18, at pp. 73:4-20, 104:3-12; Ragland Depo., Ex. 14, at p. 58:2-3.

39. Just days after sending the $750,000 demand letter, Mr. Ozinga reiterated to American Modern that TOD had no "actual" loss.  He further advised that despite his opinions, Mr. Trotter was "nervous" and wanted to settle, due to the large numbers in Trotter Overhead Door's expert report. *See* August 22, 2013 Email, attached as Exhibit 25.

40.  Ms. Wood called and emailed Mr. Ozinga to confirm her understanding of the case, Mr. Ozinga's valuation, and Trotter Door's potential exposure. *See* August 26, 2013 Email, attached as Exhibit 26.

41.  Mr. Ozinga reiterated his view of the case that this was a family dispute and that the probable jury verdict would be less than $100,000. Mr. Ozinga never gave American Modern any other value for Trotter Door's potential exposure for the upcoming October trial.  *See* August 28, 2013 Email, attached as Exhibit 27; Ozinga Depo., Ex. 9, pp. 195:14-25, 196:5-9; Wood Depo, Ex. 12, at p. 115:8-11.

42. American Modern advised Mr. Trotter that it was willing try the case. *See* September 17, 2013 Letter, attached as Exhibit 28.

43. American Modern obtained additional overage opinions from Mr. Hayden. Specifically, Mr. Hayden opined the trademark infringement claims would be covered under the Policy as intent is not an element of the claim. Meanwhile, the claims for cybersquatting, the Oklahoma Deceptive Trade Practices Act, and common law claims require intent and deliberate bad faith, such that the Policy's willful intent exclusions would bar coverage. *See* February 24, 2013, August 22, 2013, August 23, 2013, September 20, 2013 Coverage Opinions, attached collectively as Exhibit 29.

**E.    The October Judicial Settlement Conference and Settlement of the Underlying Case.**

44. A week before the October trial, the court offered the parties a judicial settlement conference with the Honorable Lee R. West.  *See* September 24, 2013 Email, attached as Exhibit 30.

45. Prior to the settlement conference, Mr. Ozinga's evaluation of the case had not changed and he never provided American Modern with any analysis other than the verdict value was likely going to be less than $100,000. Ozinga Depo., Ex. 9, at p. 268:12-16.

46. Mr. Trotter's lawyers both testified he was not realistically facing any excess exposure. Miller Depo., Ex. 7, at pp. 26:25 – 27:1, 27:25 – 28:1; Ozinga Depo., Ex. 9, at p. 227:1-21.

47. As Mr. Trotter's own defense counsel, Mr. Ozinga's continuous $100,000 valuation did not take into account any potential coverage issues. Ozinga Depo., Ex. 9, p. 196:19-23; Lamb Depo., Ex. 17, at p. 146:16-21.

48. American Modern again evaluated the case prior to the settlement conference, and once more relied upon Mr. Ozinga's opinion that the case was defensible and that Trotter Doors had limited exposure at trial. Wood Depo., Ex.12, at pp. 156:24-25 – 157:1-2. Despite Mr. Ozinga's $100,000 probable maximum exposure, American Modern was willing to pay up to $300,000 to resolve the case at the settlement conference. *See* September 27, 2013 Email, attached as Exhibit 31. There is no evidence that American Modern ever considered the coverage issues or the potential for an award of non-covered damages at trial in its pre-settlement conference evaluation.

49. Ms. Wood understood, however, that she was authorized to pay up to the Policy limits should facts come to light at the settlement conference that could change the valuation. *Id.*; Wood Depo., Ex. 12, at p. 236:15-21.

50. American Modern issued a Supplemental Reservation of Rights letter on October 1, 2013. Supplemental Reservation of Rights letter, attached as Exhibit 32.

51. At the settlement conference, the parties finalized their understanding of the Branding Terms, including the domain names, use of the "Trotter" name, use of Brent Trotter's name, use of the horse logo, use of key words, use of the phrase "Since 1964", use of the trademark "A Family Business Doing Business With Families", use of "Formerly Trotter Doors", and use of advertising and publications. Transcript of Settlement Agreement, Ex. 33.

52. Just as it had in the mediation, TOD also wanted money in exchange for these concessions and to resolve the Underlying Lawsuit. Trotter Depo., Ex. 2, at p. 163:14-20;

Ozinga Depo., Ex. 9, at p. 221:3-25. After negotiation, TOD's final demand was $550,000. *Id.*; Ozinga Depo., Ex. 9, at p. 239:4-8.

53.  American Modern advised Trotter Doors that it was willing to pay $275,000 to settle the case, but would try the case if it did not settle. Trotter Depo., Ex. 2, at pp. 166:15-25, 167:1-6, 169:1-5, 170:2-7. Ms. Wood explained that American Modern's contribution to the settlement would be to get out and be done with the Underlying Lawsuit. Wood Depo., Ex. 12, at pp. 257:24-25 – 258:1-2; Ozinga Depo., Ex. 9, at p. 248:6-16; Deposition of Patti Potash, at pp. 117:1-6, 120:1-5, attached as Exhibit 34.

54.  At that point, Mr. Trotter testified he was concerned about the Branding Terms and decided he wanted to settle the case and pay the remaining $275,000. Trotter Depo., Ex. 2, at p. 174:16-23 ("I was more concerned about getting the details . . . handled, as far as we got the name."). Mr. Trotter further testified that there was no particular claim that was in his mind that TOD was asserting against Trotter Doors that formed his decision to pay the $275,000. Only that "it needed – it needed to be settled." *Id.* at p. 175:9-16.

55.  Mr. Trotter testified that American Modern never once asked him to contribute his own money to the settlement and that he did so because he wanted the case to be over. *Id.* at pp. 168:19-24, 169:20.

56.  These Branding Terms had monetary value. Specifically, the horse logo and the use of Brent Trotter's name, were worth $500,000 "on the go-forward basis for people identifying Brent." Ozinga Depo., Ex. 9, at p. 153:18-24; *see also* Miller Depo., Ex. 7, at p.44:1-22.

57. Trotter Doors' contribution to the settlement was for the "concessions" with respect to the trademark issues. Ozinga Depo., Ex. 9, at pp. 153:25 – 154:1-8.

58. Trotter Doors and Mr. Trotter contributed to the settlement because "he did not want to go to trial and risk losing everything he had built," as he could have lost the negotiated Branding Terms. Ozinga Depo., Ex. 9, at p. 240:23-24; Miller Depo., Ex. 7, at p. 131:2-8.

59. The fact that Trotter Doors could use the horse logo, did not have to give up the domain names, and that "Brent Trotter" could be used, were "huge issues." Ozinga Depo., Ex. 9, at p. 277:17-21.

60. Everyone present at the settlement conference testified that American Modern did not require or in any way force Trotter Doors to contribute $275,000 to the settlement. *See* Ozinga Depo., Ex. 9, at pp. 282:21-25 – 283:1-24; Trotter Depo., Ex. 2, at pp. 168:19-24, 169:20; Wood Depo., Ex. 12, at pp. 266:14-15, 275:17-20.

61. Brent Trotter admitted in his deposition that American Modern did not force him to pay the $275,000 to settle the case. Trotter Depo., Ex. 2, at p. 169:20.

62. Mr. Trotter agreed that there was no discussion at the settlement conference about the parties needing to come to an agreement with regard to each contributing to the settlement.  Trotter Depo., Ex. 2, at p. 173:11-15.

63. The parties' settlement was then recited in open court.  There is nothing in the record to suggest that Trotter Doors or American Modern agreed that Trotter Doors could make a voluntary payment and later sue American Modern for its contribution for the

Branding Terms.  Transcript of Settlement Agreement, Ex. 33; Wood Depo., Ex. 12, at p.

267:15-17.

### F. The Parties in the Underlying Lawsuit Negotiate a Settlement Agreement, Excluding American Modern From Participating

64. Following the settlement conference, a Settlement Agreement was negotiated

by counsel for TOD and Trotter Doors, and was sent to American Modern's defense

adjusters on November 11, 2013. *See* November 11, 2013 Email, attached as Exhibit 35.

65. Mr. Ozinga was well aware that American Modern had coverage counsel, but

excluded American Modern from participating in negotiating the Settlement Agreement.

Miller Depo., Ex. 7, at p. 149:15-19; Ragland Depo., Ex. 14, at pp. 245:25 – 246:1-2.

66. The Settlement Agreement did not contemplate the release of American

Modern, even though American Modern was making a payment under the Settlement

Agreement. *See* November 11, 2013 Email, Ex. 35; Deposition of Brenda Badders at pp.

58:23-25 – 59:1-2, attached as Exhibit 36.

67. As such, American Modern requested that American Modern and the companies

handling the claim be added to the release. November 11, 2013 Email, Ex. 35.

68. Ultimately the Settlement Agreement was revised to include the release of

American Modern by TOD only. *See* November 19, 2013 Email, attached as Exhibit 37.

69. The Settlement Agreement did not include a release of American Modern by

Trotter Doors. *See* Settlement Agreements signed by TOD and Trotter Doors (collectively

"Settlement Agreement"), attached as Exhibit 38.

70.  American Modern then requested Ms. Patti Potash, national coverage counsel, to review the Settlement Agreement to ensure it protected American Modern's rights. Ms. Potash reviewed the Settlement Agreement and opined that due to payment over time from Trotter Doors and due to the bad faith implication letter from Trotter Doors, a release was needed to protect American Modern. *See* November 20, 2013 Email, attached as Exhibit 39; Lamb Depo., Ex. 17, at p. 261: 9-25; Potash Depo., Ex. 34, at p. 104:12-19.

71. As such, Ms. Potash, emailed the attorneys for both TOD and Trotter Door requesting that specific release wording be added to the Settlement Agreement to protect American Modern. *See* November 20, 2013 Email, attached as Exhibit 40.

72. Mr. Ozinga separately emailed counsel for TOD and stated that he was not inclined to do this, and preferred the language already in the Settlement Agreement. *Id.* Mr. Ozinga also instructed Ms. Potash not to communicate with TOD's counsel. *See* November 21, 2013 Email, attached as Exhibit 41.

73.  Despite American Modern's attempts to be included in drafting the Settlement Agreement, any proposed wording by Ms. Potash was rejected. *Id.*

74.  American Modern paid $275,000 to TOD to protect its insured. *See* November 25, 2013 letter, attached as Exhibit 42.

75.  As American Modern was not fully protected by the Settlement Agreement, Ms. Potash continued to attempt to work with Mr. Ozinga and Trotter Doors, to obtain a release. *See* November 25, 2013 Email, attached as Exhibit 43.

76.  Trotter Doors refused to sign a release. *See* December 4, 2013 Email Chain, at pp. 3-4, attached as Exhibit 44; Ozinga Depo., Ex. 9, at p. 263:2-10.

14

### G.     Trotter Doors v. American Modern Lawsuit

77. On December 3, 2014, Brenton Wayne Trotter and Doortec, LLC, formally known as Trotter Doors, (collectively, "Trotter Doors") sued American Modern in the District Court of Oklahoma County, Oklahoma, for breach of contract and bad faith for the alleged failure and refusal of payment of the full indemnity amount and other policy benefits in the Underlying Lawsuit. *See* Complaint [Doc. 1-5].

78. The Lawsuit also alleges that American Modern acted intentionally and with malice toward Trotter Doors, such that it is entitled to punitive damages. *Id.*

### H.     American Modern's Policy

79. Under the Policy, American Modern

[w]ill pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. . . We may, at our discretion, investigate any offense and settle any claim or "suit" that may result.

Policy, CG 00 01 07 98, Ex. 3, p. 4 of 11.

80. The Policy excludes coverage for "personal and advertising injury"

[c]aused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict 'personal and advertising injury.

*Id.*

81. The Policy also excludes coverage for "personal and advertising injury" "arising out of a breach of contract. . ." *Id.*

82. The Policy mandates that "[n]o insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent." *Id.* at p. 8 of 11.

83. With regard to American Modern's ability to be sued, the Policy also provides:

No person or organization has a right under this Coverage Part:

a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

b. To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured obtained after an actual trial; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claim or the claimant's legal representative.

*Id.*

## II.   <u>LEGAL STANDARD</u>

Summary judgment pursuant to the Federal Rule of Civil Procedure Rule 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *Kendall v. Watkins,* 998 F.2d 848, 850 (10th Cir. 1993). Summary judgment is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." *Boggs v. Great N. Ins. Co.*, 659 F. Supp. 2d 1199, 1204 (N.D. Okla. 2009) (internal citations

omitted). Judgment as a matter of law is warranted where, as here, the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. *Id*. ("summary judgment in favor of the insurer is proper when the undisputed facts show that the insured has failed to establish a covered claim under its insurance policy").

## III.   <u>ARGUMENT AND CITATION OF AUTHORITY</u>

This case is nothing more than a blatant attempt by Trotter Doors and Mr. Trotter to collect hundreds of thousands of dollars they paid to purchase the intellectual property (the Branding Terms) from TOD.   When American Modern received notice of the Underlying Lawsuit, it properly investigated the claims and hired Trotter Doors own personal counsel, a well-respected intellectual property lawyer, to defend the case.  Most of the two-year litigation was spent fighting over the Trotter name and negotiating the Branding Terms that were "crucial" to Trotter Door's future business.  Then, when the case was headed for trial, American Modern stood by Trotter Doors ready to defend its insured to the end.  The parties, however, were given one last chance to reach a settlement with Judge West.

After Mr. Ozinga had negotiated very favorable Branding Terms for Trotter Doors, TOD wanted $550,000 for these concessions. TOD had claimed throughout the Underlying Lawsuit that Trotter Doors was not entitled to these Branding Terms.   TOD was also demanding money for Trotter Doors' alleged wrongful use of these terms for the past few years.   Despite being told by Mr. Ozinga, for the entirety of the litigation, that the jury would never award more than $100,000 in this family dispute, American Modern offered to contribute nearly three times that amount ($275,000) to settle.  At that point, Trotter

Doors and Mr. Trotter decided, without any prompting from American Modern whatsoever, to pay the additional $275,000 to avoid trial and purchase the Branding Terms (half of what they were worth) that he testified was his main concern at the settlement conference. American Modern was then improperly frozen out of any participation in drafting the Settlement Agreement to ensure its rights were protected, despite its agreement to pay half of the settlement amount.

Despite all this, Trotter Doors attempts to claim that American Modern breached the Policy and acted in bad faith by hiring Mr. Trotter's own lawyer to defend the Underlying Lawsuit, relying on Mr. Ozinga's opinions, and then paying nearly three times what Mr. Ozinga told them the case was worth to help Trotter Doors settle the case. Trotter Doors is not entitled to be indemnified under the Policy for the money it spent to purchase these Branding Terms (or for any other non-covered claims such as its willful trademark infringement and cybersquatting). Trotter Doors wishes this Court to ignore the undisputed facts, and instead attempts to nitpick and Monday morning quarterback American Modern's claim file in an effort to create a bad faith case, where none exists, so that it can recoup the costs to purchase intellectual property that was likely never Trotter Doors'.

Trotter Doors' smoke and mirrors approach cannot hide the fact that it has no viable breach of contract claim, much less a bad faith claim against American Modern. As to the breach of contract claim, the Policy only requires American Modern to pay for sums that Trotter Doors became legally obligated to pay as damages for a "personal and advertising injury." This would not include the claims made against Trotter Doors and the damages resulting for the willful and intentional trademark infringement and cybersquatting. While

18

American has the right to investigate and settle any claims, it is not obligated to pay for the Branding Terms Trotter Doors purchased or any other monies Trotter Doors contractually agreed to pay in the Settlement Agreement.  Moreover, American Modern is not required to pay for Trotter Doors' voluntary payments, and is subject to suit only for payments resulting from either final judgment or a settlement agreement between American Modern, its insured, and the claimant, neither of which occurred here.  Without a viable cause of action for breach of contract, American Modern is entitled to summary judgment as a matter of law.

Trotter Doors' bad faith claim is likewise fundamentally flawed because without a viable breach of contact case, its bad faith claim may not survive.  Even if Trotter Doors has a breach of contract claim (which it does not), there is no establishing bad faith evidence.  American Modern hired and relied upon Mr. Trotter's chosen counsel, Mr. Ozinga, to defend and evaluate the case.  American Modern aggressively defended Trotter Doors and ultimately contributed nearly three times more than Mr. Ozinga's evaluation of Trotter Doors probable exposure at trial.  There can be no plausible argument that American Modern's conduct was unreasonable and this is not bad faith as a matter of law.

A.   **Trotter Doors Cannot Meet Its Burdon of Proof that American Modern Breached the Policy**

The seminal issue in this case is whether Trotter Doors can prove that the $275,000 it contributed to settle the Underlying Lawsuit, despite no legal obligation to do so, falls within the terms and conditions of the Policy so that American Modern breached its obligations under the Policy.  To prevail on this claim, Trotter Doors must prove (1)

formation of a contract; (2) breach of the contract; and (3) damages as a direct result of the breach. *Higgins v. Allstate Indemnity Company*, No. CIV-14-959-R, 2015 WL 7458647 at *3 (W.D. Okla. Nov. 23, 2015) (unpublished). The interpretation of an insurance contract is governed by state law and, as this Court is sitting in diversity, it must look to the law of the forum state. *Houston Gen. Ins. Co. v. Am. Fence Co., Inc.*, 115 F.3d 805, 806 (10th Cir. 1997) (applying Oklahoma insurance law). In Oklahoma, interpretation of an insurance contract is a matter of law. *Max True Plastering Co. v. U.S. Fid. and Guar. Co.*, 912 P.2d 861, 869 (Okla. 1996). Oklahoma law recognizes that a liability insurance policy generally contains two basic duties -- the duty to defend and the duty to indemnify. *First Bank of Turley v. Fidel and Deposit Ins. Co.*, 928 P.2d 298, 302-03 (Okla. 1996). Here, Trotter Doors, as the insured, has the burden of showing that its claim is covered under the policy. *See U.S. Fid. and Guar. Co. v. Briscoe*, 239 P.2d 754, 756 (Okla. 1952) (noting that "the contractor must bring himself within the terms of the policy, before he can establish insurer's liability thereon"); *see also Pitman v. Blue Cross and Blue Shield of Okla.*, 217 F.3d 1291, 1298 (10th Cir. 2000) (holding "the insured has the burden of showing that a covered loss has occurred").

Oklahoma recognizes that the insurer's primary duty is to provide indemnity for loss or to pay a specified amount upon determinable contingencies. *First Bank of Turley*, 928 P.2d at 303. In contrast to the duty to defend, the duty to indemnify is based upon liability in the underlying action. *Scottsdale Ins. Co. v. Owl Nite Sec., Inc.*, No. 06–CV–0097–CVE–SAJ, 2006 WL 3742102 (N.D. Okla. Dec. 15, 2006) (unpublished). An insurer is

required to indemnify the insured if the insured is held liable in the underlying action and if the policy provides coverage for the claims made against the insured. *Id*.

The duty to defend is separate from, and broader than, the duty to indemnify, but the insurer's obligation is not unlimited. *First Bank of Turley*, 928 P.2d at 303. Once an insurer receives notice of a claim and proof of loss, the insurer should evaluate the matter and make a reasonable investigation to determine whether a potential for coverage exists, which would trigger its duty to defend. *Id*. An insurer who disputes coverage is expressly authorized by Oklahoma precedent to defend the case under a reservation of rights. *Id*. at 304-05.

Therefore, American Modern is entitled to summary judgment where the undisputed facts show that it properly defended the Underlying Lawsuit under a reservation of rights, and that Trotter Doors has failed to establish that the $275,000 it paid was for a covered claim under the Policy that triggers American Modern's obligation to pay. *See*, *e.g., VBF, Inc. v. Chubb Group of Ins. Cos.*, 263 F.3d 1226 (10th Cir. 2001) (affirming the district court's grant of summary judgment to the insurers where the undisputed facts established that, under Oklahoma law, the insured's claims were not covered under any of the policies).

1. <u>The Underlying Lawsuit Sought Both Covered and Non-Covered Claims</u>

To analyze Trotter Doors' claims here, it is first necessary to determine which claims asserted against it were covered under the Policy. As discussed above, TOD sued Trotter Doors and Mr. Trotter for numerous claims of intellectual property infringement, including (1) trademark infringement under Section 43(a) of the Lanham Act, 15 USC § 1125(a); (2)

violation of the Anticybersquatting Consumer Protection Act; (3) violation the Oklahoma Deceptive Trade Practices Act ("ODTPA"); and (4) violation Oklahoma's common law for unfair competition and trademark infringement. *See generally*, Underlying Complaint, Ex. 1. TOD's primary relief sought was to enjoin and restrain Trotter Doors from using its marks and domain names, engaging in any conduct likely to lead to confusion, infringing upon TOD's marks or unfairly competing in any manner, and/or impersonating TOD in any capacity. *Id.* at p. 10. TOD also sought its actual damages, an accounting and disgorgement of Trotter Doors' profits, and treble damages related to its infringement claims, statutory damages of $100,000 per domain name for cybersquatting, plus attorneys' fees and costs. *Id.* at p. 11.

There is no dispute that the only possible coverage for the Underlying Lawsuit is under the Policy's Personal and Advertising Injury Liability, which provides that American Modern will pay sums that Trotter Doors became legally obligated to pay as damages because of a "personal and advertising injury." Policy, CG 00 01 07 98, Ex. 3, at p. 4 of 11. American Modern acknowledges that this coverage would apply to claims against Trotter Doors for the "use of another's advertising idea in your 'advertisement'" or "infringing of another's advertising idea in your 'advertisement.'" *Id.*, at p. 10 of 11. The Policy, however, expressly excludes coverage for acts "caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict 'personal and advertising injury.'" *Id.*, at p. 4 of 11. The Policy also expressly excluded liability assumed by Trotter Doors in a contract or agreement. *Id.*

With this background, TOD's claims against Trotter Doors included claims and damages for both negligent and intentional/willful conduct.  As such, certain claims could be covered, but significant portions of the claims against Trotter Doors were not.  As discussed in depth below, despite all TOD's claims against Trotter Doors, it appears that the only possible damages that could be covered in the event of a jury verdict was TOD's actual damages for trademark infringement, but only if the jury found the trademark infringement was not willful.[3]

| COUNT/CLAIM | DAMAGES SOUGHT | WILLFUL/INTENTIONAL CONDUCT REQUIRED | COVERED? |
|---|---|---|---|
| I – Federal Trademark Infringement | Plaintiff's Actual Damages | No | Yes |
| I – Federal Trademark Infringement | Disgorgement of Defendants' Profits | Yes | No |
| I – Federal Trademark | Treble Damages | Does not exclusively require finding of willfulness, but will support a trebling of damages. | No had TOD proved its claims for treble damages based on willful intent. |
| I – Federal Trademark Infringement | Attorneys' Fees | Yes | No |
| II – Cybersquatting | Statutory Damages | Yes | No |
| III – DTPA | Actual damages/attorneys' fees | Yes (presumed by statute) | No |
| IV – State Trademark Infringement/Unfair Competition | Actual damages | Yes | No |
| All Claims | Injunctive Relief to Prevent Use of | n/a | No |

---

[3] American Modern notes that TOD requested a jury instruction to apportion damages for trademark infringement (its own profits) and those caused by Trotter Doors' willful trademark infringement. *See* Jury Instructions, attached as Exhibit 45.

| Count/Claim | Damages Sought | Willful/Intentional Conduct Required | Covered? |
|---|---|---|---|
|  | Marks, Logos, Slogans, Domain Names |  |  |

First, as the Policy only requires American Modern pay sums (money) Trotter Doors becomes legally obligated to pay as damages, American Modern did not, and indeed, could not, have obligations under the Policy for any of the injunctive relief sought.  Nor would American Modern be responsible for Trotter Doors purchasing from or otherwise compensating TOD for the intellectual property or Branding Terms it ultimately received as part of the parties' Settlement Agreement.

Next, TOD sought various types of monetary damages for trademark infringement, cybersquatting and its state law claims.  American Modern concedes that TOD's actual damages for Trotter Doors' trademark infringement in its advertising may have been covered had the jury returned a verdict on some of the trademark counts.[4]  TOD further claimed that it was entitled to the disgorgement of Trotter Doors' profits, treble damages, and/or an award of attorneys' fees based on Trotter Doors "bad faith" and "willful" conduct as these types of damages for trademark infringement under the Lanham Act require a showing of willful, bad faith, deliberate or malicious conduct.  Underlying Complaint, p. 6; s*ee Western Diversified Servs., Inc. v. Hyundai Motor America, Inc.*, 427 F.3d 1269, 1273 (10th Cir. 2005) (recognizing that infringer must have been found to act willfully to award defendants' profits or attorneys' fees).  Thus, because the Policy excludes coverage

---

[4] TOD appears to have treated its federal and common law trademark infringement claims as the same.  *See* Pretrial Report, attached as Exhibit 46; Plaintiff's Proposed Jury Instructions and Verdict Forms, Ex. 45.

for Trotter Doors' knowing acts to violate the rights of TOD and cause injury, any damages TOD obtained at trial flowing from this willful and bad faith conduct were not covered.

TOD also sought to impose liability and damages under the DTPA.  The DTPA makes actionable deceptive trade practices, defined in the statute as "pass[ing] off goods ... as those of another," or "knowingly mak[ing] a false representation as to the source ... of goods." *Thompson v. Haynes*, 305 F.3d 1369, 1378 (Fed. Cir. 2002) (citing DTPA § 53(A)).  An intent to deceive need not be shown to make out a claim under the DTPA because the legislature has made evidence of a deceptive trade practice.  *Id*. (citing § 53(B)).  Notably, the statute states that "[e]vidence that a person has engaged in a deceptive trade practice shall be prima facie evidence of intent to injure competitors and to destroy or substantially lessen competition."  DTPA § 53(B).  TOD sought damages and attorneys' fees under the DTPA for Trotter Doors' alleged knowing and false representations as to sponsorship, approval, affiliation, association with TOD's business, to pass off Trotter Doors' work as that of TOD and vice versa, and to trade on TOD's good will.  Had TOD proven its DTPA case and the jury returned a verdict in its favor, Trotter Doors' would have been statutorily deemed to have committed these acts with the intent to injure TOD or lessen its competition.  Again, the Policy expressly excludes coverage for Trotter Doors' knowing violation of TOD's rights and intent to cause personal and advertising injury. Therefore, the DTPA claims were not covered if the jury had returned a verdict including any potential recovery for actual damages or attorneys' fees.

TOD also sought to recover against Trotter Doors for common law unfair competition.  Again, this claim required TOD to prove that Trotter Doors' actions were

calculated to deceive.  The Supreme Court of Oklahoma stated that unfair competition requires "the acts of defendant are such as are calculated to deceive the ordinary buyer making his purchases under the ordinary conditions which prevail in the particular trade to which the controversy relates."  *Coalgate Abstract Co. v. Coal County Abstract Co.*, 67 P.2d 37, 40 (1937).  The test is whether "the ordinary buyer, exercising ordinary intelligence and observation in business matters, will certainly or probably be deceived[;] a mere possibility of deception and confusion [is] insufficient." *Carpet City, Inc. v. Carpet Land, Inc.*, 335 P.2d 355, 358 (Okla. 1958).  Consistent with this law, TOD contended that Trotter Doors "intentionally, knowingly, and willfully" used confusingly similar imitations of TOD's marks with the "calculated purpose of harming or trading" on TOD's goodwill and business reputation.  Underlying Complaint, Ex. 1, at p. 9.  Had the jury agreed, Trotter Doors would have again been found liable for knowingly violating TOD's rights with the intent to injure.  Once more, any damages flowing from these claims were likewise excluded.

TOD's final claim against Trotter Doors was for violation of the Anticybersquatting Consumer Protection Act.  Under this Act, TOD sought statutory damages for Trotter Doors purchase of domain names and diversion of traffic to its own websites.  In the Court's Order denying summary judgment in the Underlying Lawsuit, Judge Heaton noted that under the cybersquatting occurs under 15 U.S.C. § 1125(d)(1)(A) upon registration of the protected domain name coupled with bad faith intent to profit. *Trotter Overhead Door, Inc. v. Trotter Doors, LLC*, No. CIV–11–1348–HE, 2013 WL 3283346 at *5 (W.D. Okla. June 23, 2013).  Bad faith conduct with the intent to profit from cybersquatting would be

excluded based on the Policy's exclusion for knowing violations of TOD's rights and intent to cause injury.

Based on the foregoing, American Modern would only be required to indemnify Trotter Doors and Mr. Trotter for their negligent trademark infringement, and nothing else.

### 2. American Modern Met Its Duty to Defend

Under Oklahoma law, when American Modern was faced with both covered and non-covered claims, the general rule is that if American Modern's duty to defend is triggered, it must defend all the non-covered claims in the Underlying Lawsuit. *Automax Hyundai S., L.L.C. v. Zurich Am. Ins. Co.*, 720 F.3d 798, 806 (10th Cir. 2013) (applying Oklahoma law). Here, as expressly permitted by Oklahoma law, American Modern chose to defend the Underlying Lawsuit under a reservation of rights. *First Bank of Turley*, 928 P.2d at 303. American Modern met this obligation to defend Trotter Doors by hiring Trotter Doors' own personal counsel (an intellectual property expert) and providing any and all means to defend the case. There is absolutely no evidence that American Modern failed to defend Trotter Doors. Indeed, American Modern paid Trotter Doors' personal counsel nearly $300,000 to defend the case. This included negotiating the Branding Terms to benefit and be used by Mr. Trotter's new business trade name going forward.

### 3. American Modern Has No Duty to Indemnify Trotter Doors for Its Voluntary Payment to Settle the Underlying Case

In Oklahoma, an insurer's duty to indemnify is determined at the outcome of the third party action against its insured. *First Bank of Turley*, 928 P.2d at 302. Yet, American Modern "need only indemnify claims falling within the policy's scope." *Automax Hyundai*

*S., L.L.C.*, 720 F.3d at 806. This general law is supported by the Policy's insuring clause which states that "American Modern will pay sums that [Trotter Doors] became legally obligated to pay as damages because of a 'personal and advertising injury'". Policy, CG 00 01 07 98, Ex. 3, at p. 4 of 11. Trotter Doors' expense to purchase intellectual property and the Branding Terms is not a legal obligation to pay because of personal and advertising injury. As such, Trotter Doors' claim for the Branding Terms do not even trigger the Policy's insuring clause.

a.     *Trotter Doors' May Not Recover Its Voluntary Payment*

In reality, Trotter Doors' decision to purchase the Branding Terms and contribute $275,000 because the case just "needed to be settled", is a voluntary payment. Voluntary payments are actually contemplated and precluded by the Policy. The Policy's Conditions expressly state that "[n]o insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent." Policy, CG 00 01 07 98, Ex. 3, at p. 8 of 11. When Trotter Doors voluntarily settled the case, it did so at its own peril. As discussed in depth below, the fact that American Modern was at the settlement conference and agreed to contribute to the settlement is not consent required under the Policy.

Although there are no Oklahoma decisions on point to the facts here, numerous courts have found that the voluntary payment provision applies where both the insured and insurer contribute to a settlement. *McMahon v. Med. Protective Co.*, 92 F. Supp. 2d 367, 376-78 (W.D. Pa. 2015) (finding "[n]othing in the exclusion indicates that it applies only to settlements made solely by the insured, and not to settlements in which the insured agrees

28

to pay more than offered by the insurer."); *see also Trinity Outdoor, LLC v. Central Mut. Ins. Co.*, 285 Ga. 583, 586 (2009); *Low v. Golden Eagle Ins. Co.*, 110 Cal. App. 4th 1532, 1544-46 (2003). These courts have found that the purpose of precluding voluntary payments is "to prevent collusion and to grant the insurer the right to take complete and exclusive control of the settlement and defense of claims or suits against the insured." *McMahon*, 92 F. Supp. 2d at 376. Further, under the clear language of the provision, the insurer must consent to a payment, obligation or expense before the insurer is liable for that amount. *W. Bend Mut. Ins. Co. v. Arbor Homes LLC*, 703 F.3d 1092, 1096-97 (7th Cir. 2013); *see also Travelers Ins. Co. v. Maplehurst Farms, Inc.,* 953 N.E.2d 1153, 1161 (Ind. Ct. App. 2011) (when an insured enters into a settlement agreement without the insurer's consent in violation of a voluntary payment provision, that obligation cannot be recovered from the insurer).

The United States District Court for the Western District of Pennsylvania's decision in *McMahon* is especially instructive here. In *McMahon*, the district court found that the insured was not entitled to seek reimbursement for funds contributed to a settlement, even where the insurer and the insured both contribute to the settlement, because the payment was voluntary and at the insured's own expense. *McMahon*, 92 F. Supp. 2d 367. The District Court in *McMahon* found that the voluntary payment clause gave the insurer the exclusive authority to control the defense and settle a case, even where the settlement is hashed out at a mediation or settlement conference with the insured and insurer in the same room. *Id.* at 376.

Additionally, the Georgia Supreme Court, in responding to two certified questions from the United States District Court for the Northern District of Georgia, found that the voluntary payment provision applied to bar an insured's claim for reimbursement of its decision to pay the difference of the plaintiff's demand and what the insurer was offering to settle a wrongful death case. *Trinity*, 285 Ga. at 585-87. In *Trinity*, the insurer offered $200,000 on the insured's behalf to settle the case.  Fearing an excess verdict, the insured agreed to contribute $954,530 to a global settlement with other defendants. *Id.*  When the insured demanded payment of the other $754,530, the insurer refused to pay what it deemed a voluntary payment. *Id.* at 584.  The Georgia Supreme Court, relying on an identical voluntary payment provision, found that the insured's payment above and beyond what the insurer was offering was a voluntary payment. *Id.*  The *Trinity* Court also found, like the Policy here, that the insurance contract clearly stated that the insurer would be liable to pay those sums that the insured is legally obligated to pay, but that a "voluntary payment does not constitute a legal obligation." *Id.*

Just like in *McMahon* and *Trinity Outdoor*, American Modern properly defended Trotter Doors under a reservation of rights and was willing to contribute significantly more to resolve the case than the $100,000 Mr. Ozinga repeatedly told American Modern the case was worth.  Despite its own counsel's belief that Trotter Doors would never be exposed to an excess verdict, Trotter Doors chose to make a voluntary payment for $275,000 just weeks before trial.  In exchange, Trotter Doors obtained the favorable Branding Terms Mr. Ozinga had negotiated.  Mr. Ozinga valued these Branding Terms as worth more than $500,000 to Mr. Trotter's business.  Thus, the option to purchase them

30

for $275,000 was advantageous to the business going forward.  Ozinga Depo., Ex. 9, at pp. 153:18 – 154:1-8; Trotter Depo., Ex. 2, at p. 174:16-23.

Per the Policy, American Modern had the exclusive right to settle and Trotter Doors had no right to make unilateral settlements or voluntary payments to third parties without American Modern's permission. Further, there is no evidence that American Modern requested, forced, or otherwise "consented" to such payment, or that American Modern contemplated that it would later owe Trotter Doors the $275,000. Ozinga Depo., Ex. 9, at pp. 282:21-25 – 283:1-24; Trotter Depo., at Ex. 2, at pp. 168:19-24, 169:20; Wood Depo. at Ex. 12, at pp. 266:14-15, 267:15-17, 275:17-20; Transcript of Settlement Agreement, Ex. 33. Indeed, Ms. Wood testified that she advised Mr. Ozinga and Mr. Trotter at the settlement conference that American Modern was paying its $275,000 to be done with the case. Wood Depo., Ex. 12, at pp. 257:24-25 – 258:1-2; Ozinga Depo., Ex. 9, at p. 248:6-16. Mr. Trotter agreed that there was no discussion at the settlement conference about the parties needing to come to an agreement with regard to each contributing to the settlement. Trotter Depo., Ex. 2, at p. 173:11-15. Just like in *McMahon* where the insured and insurer sat side by side during a mediation and the insured decided to "bridge-the-gap" to get the case settled, Ms. Wood's testimony is clear that American Modern did not consent to a voluntary payment that Trotter Doors could later seek to recoup from American Modern.

Mr. Trotter wanted the case to be over and he wanted to ensure he got the Branding Terms he desired.  He had every right to pay $275,000 to bridge-the-gap and settle the case, despite Mr. Ozinga's $100,000 evaluation of the probable exposure at trial.  While Trotter Doors had every right to pay for the Branding Terms and to get the case over, this was a

voluntary payment made by Trotter Doors.  As such, Trotter Doors has no legal basis to recover its voluntary payment and American Modern is entitled to summary judgment as a matter of law.

> b.  *Trotter Doors' Lawsuit Is Barred by the Policy's Legal Action Against Us Provision*

In line with the voluntary payment provision, Trotter Doors' breach of contract claim is also barred by the Policy's Legal Action Against Us provision.  This unambiguous provision limits when American Modern may be sued:

> No person or organization has a right under this Coverage Part:
>
> a.  To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or
>
> b.  To sue us on this Coverage Part unless all of its terms have been fully complied with.
>
> A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured obtained after an actual trial; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claim or the claimant's legal representative.

Policy, CG 00 01 07 98, Ex. 3, p. 8 of 11.

Based on this provision, Trotter Doors agreed that no action will lie against American Modern, except to force the compliance with an agreed settlement or to collect a final judgment after an actual trial.  Neither applies here.  There was no trial and no final judgment.  There was also no settlement agreement, as that term is expressly defined in the policy as "a settlement and release of liability signed by us, the insured and the claim or claimant's legal representative." *Id*.  To be sure, American Modern attempted to participate

in a Settlement Agreement, but was rebuffed and frozen out of the negotiations by Mr.

Ozinga's firm and TOD's counsel.  Miller Depo., Ex. 7, at p. 149:15-19; Ragland Depo.,

Ex. 14, at pp. 245:25 – 246:1-2.  American Modern was never given the opportunity to

participate in drafting or signing as a party to the Settlement Agreement.  Because there is

no genuine issue of material fact as American Modern, Trotter Doors, and TOD never

signed a settlement agreement and release as contemplated by the Policy, Trotter Doors

claims are barred as a matter of law.

Once more, as this is a rare situation, there is no Oklahoma law on point addressing

the scenario where an insured seeks to recover for its contribution to a settlement, but for

monies promised in a settlement agreement to which the insurer is not a party.[5]  However,

the Georgia Supreme Court in *Trinity Outdoor* also held that the insured's lawsuit was

barred by the insurer's nearly identical "Legal Action Against Us" provision.  *Trinity*

*Outdoor*, 679 S.E.2d at 11.  Just like the case here, Trinity Outdoor could not meet the

provisions plain and unambiguous terms that preclude suits where there was no final

judgment or a settlement agreement that included the insurer.  *Id*.  The Georgia Supreme

Court reasoned that absent a complete refusal to defend,

> The insurance contract also made it clear that Trinity could sue Central only
> about agreed upon settlements and judgments following a jury trial. This is the
> bargain that Trinity struck with Central [the insurer], and *Dowse* cannot be
> used to circumvent that bargain.[6]

---

[5] Federal courts applying Oklahoma law have enforced similar no suit provisions setting forth conditions that must be complied with before an insured can file suit against an insurer in first party cases. *See Hayes v. State Farm Fire & Cas. Co.*, 855 F. Supp. 2d 1291, 1301 (W.D. Okla. 2012) (finding "suit against us" clause in the insurance policy was not ambiguous, was enforceable, and operated to bar plaintiff's breach of contract claim); *Caton v. State Farm Fire & Cas. Co.*, No. CIV-06-1112-F, 2007 WL 2993869, at *5 (W.D. Okla. Sept. 19, 2007) (enforcing a similar policy's "Legal Action Against Us" provision according to "its plain and ordinary meaning.").

[6] *Southern Guaranty Ins. Co. v. Dowse*, 278 Ga. 674, 605 S.E.2d 27 (2004) prevents an insurer from relying upon a no action clause where it refuses to defend and completely abandon its insured, which was not the case in *Trinity*

*Id*.  The Georgia Supreme Court found that the no-action provision barred coverage separate and apart from the insurance contract's prohibition against the voluntary payments.  *Id*.; *see also KY II Realtors v. Dips Pest Control Serv.*, No. 3:08-CV-1135-K, 2009 WL 1532061 (N.D. Tex. June 1, 2009) (granting summary judgment under same "Legal Action Against Us" provision, even where insurer was present at and allegedly approved the settlement terms, but was not a party to the settlement agreement).

Just like in *Trinity and KY II Realtors*, the Legal Action Against Us provision in the Policy bars Trotter Doors' claim that American Modern should reimburse it for its settlement contribution of $275,000.  With respect to the Underlying Lawsuit, the Policy makes clear that Trotter Doors could sue American Modern with respect to a signed settlement agreement and release of liability signed by **American Modern, Trotter Doors and TOD.** There can be no dispute regarding the absence of any settlement agreement and release as contemplated by the Policy, as American Modern was precluded from participating in drafting and did not execute any agreement.  Miller Depo., Ex. 7, at p. 149:15-19; Ragland Depo., Ex. 14, at pp. 245:25 – 246:1-2.  Ironically, American Modern's coverage counsel, Ms. Potash, repeatedly asked to participate in drafting the Settlement Agreement, but was swiftly rebuffed by Trotter Doors and TOD.  Trotter Doors cannot absolve itself of the Legal Action Against Us condition where its counsel rebuked

---

*Outdoor*.  Nor is it the case here.  Moreover, other courts have not hesitated to enforce legal action against us provisions, and are generally reluctant to find waiver of the provision in the absence of a complete refusal to defend the insured. *See French v. Assurance Co. of Am.*, No. 1:04CV550 JCC, 2006 WL 2975651, at *3 (E.D. Va. Oct. 16, 2006) (finding that in order for a court to "hold that the insurer has waived his consent, the insurer must either deny liability or refuse to defend the insured."); *Missouri Prof'l Liab. Ins. Ass'n v. Am. Cas. Co. of Reading, Pennsylvania*, 760 F. Supp. 783 (W.D. Mo. 1991).

American Modern's repeated attempts to participate in negotiating and drafting the type of settlement agreement and release contemplated in the Policy.   Without a settlement agreement that Trotter Doors can point to that was signed by American Modern obligating it to pay the additional $275,000, Trotter Doors' lawsuit is barred by the Legal Action Against Us provision.

### B. Equity Further Bars Trotter Doors' Attempt to Recover the $275,000 it Paid to Acquire the Branding Terms and/or for Non-Covered Claims

Even if Trotter Doors could somehow avoid the Policy's prohibition against voluntary payments and lawsuits in the absence of a settlement agreement to which American Modern must be a party, Trotter Doors' attempt to recoup its $275,000 is also barred in equity.   In Oklahoma, Trotter Doors and Mr. Trotter have the burden to demonstrate that their claim falls within the Policy, as well as to allocate the settlement between the covered and non-covered claims. *Automax Hyundai S., LLC*, 720 F.3d at 806. American Modern could only locate one Oklahoma case involving a case where an insurer defended under a reservation of rights, the insured and insurer contributed to a settlement equally, and then the insured sued the insurer for its contribution.   In *Gay & Taylor, Inc. v. St. Paul Fire & Marine Ins. Co.*, 550 F. Supp. 710, 716 (W.D. Okla. 1981), the federal district court determined that regardless of which party bore the burden of apportionment, it would examine the evidence as to the discussions leading to the settlement to see if either party could produce evidence as to what the parties contemplated in apportioning the covered and non-covered damages.   *Id*.   When they could not, the trial court held that it

"must attempt to make the apportionment in a logical manner" and ended up apportioning the settlement 50/50.  *Id.*

American Modern vigorously defended Trotter Doors and offered to contribute $275,000 to resolve the case, well in excess of the $100,000 Mr. Ozinga valued the potential exposure at trial. Mr. Trotter's lawyers both testified he was not realistically facing any excess exposure. Miller Depo., Ex. 7, at pp. 27:25 – 28:1; Ozinga Depo., Ex. 9, at p. 227:1-21. Yet, when TOD demanded $550,000 to settle the family dispute over the Branding Terms and Trotter Doors' prior use of same, Mr. Trotter apparently jumped at the chance to end the case for $275,000 and guarantee he would get the Branding Term he needed (again, valued in excess of $500,000 to his future business).

In his own words, Mr. Trotter testified that the only thing he was concerned about at the settlement conference with Judge West was getting the Branding Terms he wanted:

> Q:  Were you concerned about having to pay their fees, if you went to trial?
> A:  I was more concerned about getting the details –
> Q:  What do you mean?
> A:  -- handled, as far as we got the name.  And I'm more concerned about what's going to happen to my company, you know, my life.  And then, as far as what Judge West said to everybody, it was more of an negotiation-type meeting.
> Q:  Okay.
> A:  Rather than, you are on the hook for this, you are on the hook for that type of thing.

Trotter Depo., Ex. 2, at pp. 174:14 – 175:1. Mr. Trotter further testified that there was no particular claim that was in his mind, that TOD was asserting against Trotter Doors, that formed his decision to pay the $275,000. Only that "it needed – it needed to be settled." *Id.* at p. 175:9-16.

Even more so, Mr. Trotter could not testify at all as to why he paid the $275,000, other than he was most concerned about getting the name and preserving his business. That concession certainly came with a price tag and it is reasonable and equitable that Mr. Trotter pay for those rights, especially where he only paid half of what Mr. Ozinga valued the Branding Terms to Mr. Trotter's business going forward. The evidence shines a light on the fact that Mr. Trotter was concerned about losing his connection to the Trotter family name, the logos and advertising slogans that came with it, and numerous domain names he had spent years cultivating. In Mr. Ozinga's opinion, the Branding Terms Trotter Doors got were worth in excess of $500,000, while the probable damages exposure at trial in a few weeks was less than $100,000. Mr. Trotter simply didn't want to risk losing both and decided to settle the case with his own money.

Under *Gay & Taylor, Inc.*, the Court can decide that the parties intended to share the costs of the settlement equally. American Modern contributed much more than the case was worth, not considering any potential non-covered claims. It should not then be required to foot the additional bill of Trotter Doors' business acquisitions. Thus, the Court should find that the parties' decision to split the settlement amount 50/50 at the settlement conference with Judge West evidences their intent to apportion the potentially covered trademark claims with the non-covered purchase of the Branding Terms.

### C. American Modern's Reliance on Mr. Ozinga's Expertise and Valuation of the Case is Not Bad Faith.

Trotter Doors has made a laundry list of "bad faith" allegations that have nothing to do with American Modern's handling of the Underlying Lawsuit, including variations on

37

prohibited conduct in the Oklahoma Unfair Claims Settlement Practices Act ("UCSPA"). American Modern anticipates that Trotter Doors will attempt to distract the Court from the real issues in the case by trying to pick apart American Modern's 10,000 plus page claims file in an attempt to manufacture a negligent claims handling case to recover the money it spent buying a piece of the Trotter family brand.  Yet, negligent claims handling or a purported violation of the UCSPA is not the standard for the imposition of bad faith in Oklahoma.  In essence, what Trotter Doors is really claiming is that American Modern should be liable for bad faith when it refused to settle the Underlying Lawsuit for five times in excess of what its insured's chosen counsel viewed the case was worth.

The tort of bad faith was first recognized by the Oklahoma Supreme Court in *Christian v. Am. Home Assur. Co.*, 577 P.2d 899 (Okla. 1978). It arises from the insurer's implied duty to deal fairly and act in good faith with its insured. *Southern Hospitality, Inc. v. Zurich Am. Ins. Co.*, 393 F.3d 1137, 1142 (10th Cir. 2004). To successfully bring a bad faith claim in Oklahoma, Trotter Doors must show: (1) that it is covered under the Policy and that American Modern was required to take reasonable actions in handling the claim; (2) that the actions were unreasonable under the circumstances; (3) that American Modern failed to deal fairly and in good faith with Trotter Doors, in the handling and defense; and (4) that Trotter Doors sustained damages directly or proximately caused by American Modern's bad faith. *Badillo v. MidCentury Ins. Co.*, 121 P.3d 1080, 1093 (Okla. 2005).

First, as discussed above, Trotter Doors bad faith claim fails as a matter of law because it cannot demonstrate that it was covered for the $275,000 it spent for non-covered claims. Even if it could, Trotter Doors cannot come forward with any evidence that

American Modern's handling of the claim and decision not to pay the entire $550,000 settlement was unreasonable in light of vigorous defense of the case, Mr. Ozinga's assessment of the case, and American Modern's willingness to take the case to trial. In Oklahoma, the contractual duty to defend includes the right to control the course of the defense of the liability claim and to decide on litigation strategy. By the terms of the contract, the task of weighing the merits of settlement with the risks and costs of litigation is relinquished to the insurer. *Milroy v. Allstate Ins. Co.*, 151 P.3d 922, 927 (Okla. Civ. App. 2007).

Trotter Doors appears to be attempting to bring its bad faith claims against American Modern within the line of cases where an insurer fails to settle within its limits, thereby requiring Mr. Trotter to pay his own money.  In these cases, Oklahoma courts will consider the potential for exposure over the policy limits, particularly as evaluated by the defense counsel and find that there was no bad faith if the insurer legitimately disputed the value of the case. *Badillo*, 121 P.3d at 1095. "An insurance company's decisions regarding settlement must be made based upon a thorough investigation of the underlying circumstances of the claim and on informed interaction with the insured." *Id.* Further, an insurer's conduct may not reasonably be perceived as tortious when the facts presented to the court reveal that a legitimate dispute exists as to the value or amount of a claim. *Sellman v. Amex Assur. Co.*, No. 05-CV-545 GKFPJC, 2007 WL 1072210, at *1-3 (N.D. Okla. Apr. 4, 2007), *aff'd*, 274 F. App'x 655 (10th Cir. 2008); *Timberlake Const. Co. v. U.S. Fid. & Guar. Co.*, 71 F.3d 335, 340-41 (10th Cir. 1995) (applying Oklahoma law).

Here, American Modern properly defended Trotter Doors and Mr. Trotter under a reservation of rights.  American Modern didn't hire just any lawyer, it hired Mr. Trotter's chosen counsel who specializes in intellectual property litigation.  Mr. Ozinga admitted that American Modern gave him each and every resource he asked for to defend the case, including paying nearly $300,000 in his attorneys' fees, including significant resources devoted to negotiating the favorable Branding Terms.  When it came time to explore mediation and settlement, American Modern relied heavily upon Mr. Ozinga's evaluation of the witnesses, evidence and examination of the applicable law.  Mr. Ozinga repeatedly told American Modern the verdict exposure was less than $100,000.

Based on Mr. Ozinga's evaluation of its insured's potential exposure, American Modern offered nearly three times that amount to settle the case.  There is nothing in the record to even suggest American Modern considered the potential coverage issues and possibility of non-covered damages being awarded at trial.  There is nothing in the record to suggest that American Modern schemed to force Mr. Trotter to contribute to the settlement.  There is simply no straight-faced argument that American Modern's reliance upon Mr. Ozinga's assessment of the case was unreasonable.

Under Oklahoma law, American Modern is not liable for bad faith simply because Mr. Trotter decided to ignore his own counsel's prospects for trial and settle.  Here, all the facts and evidence available to the Court establish that American Modern's offer of $275,000 to settle the case was consistent with Mr. Ozinga's evaluation of the case and of Trotter Doors' probable exposure at the upcoming trial.  There was little to no real exposure for an excess verdict, regardless of whether the potential damages were covered or not.

40

Mr. Ozinga was not a panel lawyer or beholden to American Modern, but was Trotter Doors' personal counsel.  If American Modern cannot rely upon the investigation, evaluation and opinions as to the merits of a case performed by its insured's own chosen lawyer, then no insurer in Oklahoma could ever handle a claim in litigation in good faith. Based on these undisputed facts, there can be no genuine issue of material fact that American Modern dealt fairly with its insured and acted in good faith in its handling of the Underlying Lawsuit.  American Modern is therefore entitled to summary judgment as a matter of law.

## IV.   <u>CONCLUSION</u>

For the above mentioned reasons, Trotter Doors cannot come forward with any genuine issue of material fact to preclude summary judgment as to its breach of contract or bad faith claims.  American Modern respectfully requests that the Court grant its Motion for Summary Judgment and dismiss the Complaint with prejudice.

Respectfully submitted this 15th day of June, 2016.

**FIELDS HOWELL LLP**

| | |
|---|---|
| 1180 W. Peachtree Street, Suite 1600 | */s/ Richard E. Zelonka, Jr.* |
| Atlanta, Georgia 30309 | Richard E. Zelonka, Jr. |
| Telephone:      404.214.1250 | Georgia Bar No.: 142152 |
| Facsimile: 404.214.1251 | Florida Bar No.: 656941 |
| E-mail:      rzelonka@fieldshowell.com | |

**PERRINE, REDEMANN, BERRY, TAYLOR & SLOAN, P.L.L.C.**

| | |
|---|---|
| P.O. Box 1710 | */s/ Robert P. Redemann* |
| Tulsa, Oklahoma 74101 | Robert P. Redemann, OBA No.: 7454 |
| Telephone:  918-382-1400 | |
| Facsimile :  918-382-1499 | *Counsel for Defendant,* |
| rredemann@pmrlaw.net | *American Modern Select Insurance Co.* |

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of June 2016, a true and correct copy of the above and foregoing document was sent via U.S. Mail postage prepaid thereon to the following:

Steven S. Mansell, OBA No. 10584
Mark A. Engel, OBA No. 10796
Kenneth G. Cole, OBA No. 11792
101 Park Avenue, Suite 665
Oklahoma City, OK 73102
T:  405-232-4100
F:  405-232-4140
Mansell-engel@coxinet.net
*Counsel for Plaintiff*

/s/ Richard E. Zelonka, Jr.
Richard E. Zelonka, Jr.
