# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

BRENTON WAYNE TROTTER,　　　　　　　)
an individual, *et al.*,　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　)
　　　　　Plaintiffs　　　　　　　　　　　　　)
vs.　　　　　　　　　　　　　　　　　　　　　)　　　NO. CIV-15-024-HE
　　　　　　　　　　　　　　　　　　　　　　)
AMERICAN MODERN SELECT　　　　　　　)
INSURANCE COMPANY, a corporation,　　)
　　　　　　　　　　　　　　　　　　　　　　)
　　　　　Defendant.　　　　　　　　　　　　)

## ORDER

Brenton Trotter and the company he formed in 2009, Trotter Doors, LLC (collectively "Trotter Doors"), sued American Modern Select Insurance Company ("American Modern"), the company's insurer, asserting breach of contract and bad faith claims. Plaintiffs allege that American Modern breached the duties owed them under a commercial insurance policy when they were sued by Trotter Overhead Door, Inc., a competing automatic garage door business company owned by Brenton Trotter's uncle and for whom he had previously worked.

American Modern has filed a motion for summary judgment, which is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "A genuine dispute as to a material fact 'exists when the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party.'" Carter v. Pathfinder Energy Servs., Inc., 662 F.3d 1134, 1141 (10th Cir. 2011) (quoting Zwygart v. Bd. of Cnty. Comm'rs, 483 F.3d 1086, 1090 (10th Cir.2007)). Having

considered the submissions of the parties in light of this standard, the court concludes defendant's motion should be denied.

Background[1]

Trotter Doors became embroiled in a family dispute with Trotter Overhead Door, Inc. ("TOD") over its use of the name Trotter, certain advertising slogans and logos, and various domain names in conjunction with its business. TOD sued it, asserting federal claims for trademark infringement and cybersquatting, a violation of the Oklahoma Deceptive Trade Practices Act, and unfair competition/trademark infringement under common law.

After Trotter Doors hired Martin Ozinga, a trademark and intellectual property lawyer to defend it, American Modern, who insured Trotter Doors under a commercial liability insurance policy, agreed to defend Trotter Doors in the lawsuit subject to a reservation of rights. It sent Mr. Trotter a letter informing him that the only coverage under the policy that might apply to the claims asserted in the lawsuit would be that provided for personal and advertising injury liability. It also informed him that the policy had various exclusions. Among them was an exclusion for injuries "[c]aused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict 'personal and advertising injury." Doc. #69-5, p. 4. American Modern agreed for Mr. Ozinga to continue as Trotter Doors' attorney, but advised Mr. Trotter that "[b]ecause the insurance may not apply in whole or in part and/or there may not be adequate insurance to satisfy a

---

[1]Page references to briefs and exhibits are to the CM/ECF document and page number.

judgment, Trotter Doors, LLC and/or Brenton Wayne Trotter have the right to retain an attorney to advise them in these matters," at their own expense. Doc. # 69-5, p. 6.

The parties concur that for the first year and a half "all American Modern could do was pay [Mr. Ozinga] to defend the case, as Mr. Trotter was unwilling to relinquish using the Trotter name." Doc. #69, p. 11, ¶33. That changed, however, at a mediation that occurred in August 2013 where the parties essentially reached an agreement regarding the non-monetary issues or "Branding Terms."[2] Money then became an issue. TOD offered to settle the case for $750,000, which American Modern rejected, and the case proceeded to a settlement conference before a federal judge. The case settled at the conference for $550,000 – American Modern paying $275,000 and Trotter paying $275,000. Afterwards, Mr. Ozinga and TOD's attorneys drafted the settlement agreement. After the agreement had been finalized, American Modern's monitoring coverage counsel, Patti Potash, who had had no prior involvement in the litigation, sent TOD's attorney and Mr. Ozinga an email asking that the agreement include a release of <u>all</u> claims TOD and Trotter Doors had against American Modern. She requested that the release language be included "[i]n order to assure that American Modern is properly protected and can proceed to make timely payment of the $275,000 . . . ." Doc. #72-4, p. 93. Trotter Doors rejected the proposed wording and American Modern paid its share of the settlement, apparently by mistake. Ms. Potash

---

[2]*The Branding Terms referred to the use of the Trotter family name, advertising slogans and the use of the Trotter family horse logo, all of which had become synonymous with the automatic garage door business in the state.*

3

continued, unsuccessfully, to try to obtain a release from plaintiffs. Brenton Trotter and Trotter Doors then filed this breach of contract and bad faith action against American Modern.

Analysis

Breach of Contract

American Modern initially contends that Trotter Doors cannot establish that the $275,000 it paid to settle the TOD lawsuit was for any covered claim under the policy and therefore both its breach of contract and bad faith claims fail.[3] *See* Davis v. GHS Health Maintenance Org., Inc., 22 P.3d 1204, 1210 (Okla. 2001) ("[A] determination of liability under the contract is a prerequisite to a recovery for bad faith breach on an insurance contract."). Defendant asserts that it would only be required to indemnify Mr. Trotter and Trotter Doors for their "negligent trademark infringement and nothing else." The court concludes otherwise. The policy may also have provided coverage if Trotter Doors had been found liable for violating the Oklahoma Deceptive Trade Practices Act ("DPTA").

A person can commit a "nonwillful" violation of the DTPA. "Pass[ing] off goods or services as those of another," 78 Okla. Stat. §53(A)(1), and misappropriation of the trade name of another are among the deceptive trade practices the DPTA prohibits which can be accomplished nonwillfully. Brunswick Corp. v. Spinit Reel Co., 832 F.2d 513, 527 (10th

---

[3]To the extent American Modern argues that Trotter paid $275,000 to purchase the Branding Terms, the evidence does not conclusively support its position. See Doc. #72-4, p. 59. As Trotter notes, he made valuable concessions in the negotiations regarding the Branding Terms. Doc. #72-15, p. 3.

4

Cir. 1987);[4] Bell, 597 P.2d 753, 754, 756 (Okla. 1979). The Act also authorizes a discretionary award of attorney's fees for non-willful violations. *E.g.*, Brunswick, 832 F.2d at 529; Bell, 597 P.2d at 756 ("Even if defendant did not 'willfully' engage in deceptive trade practices the court in its discretion is authorized by the statute to award attorney fees to prevailing party."). Considering the evidence in the record regarding TOD's potential recoverable damages,[5] plus the amount of attorney's fees TOD"S counsel apparently had generated, the court concludes a question of fact exists as to whether the $275,000 paid by Trotter was attributable to a claim or claims (plus fees) covered by the policy.

American Modern's remaining contractual arguments are that the plaintiffs are barred by the insurance contract's voluntary payments and "legal action against us" provisions from recovering the $275,000 Trotter paid at the settlement conference. As will be discussed subsequently, a fact question exists was to whether Mr. Trotter's payment was voluntary. Further, the "no action" provision is inapplicable, as it was designed to preclude an action against the insurer by a third party, not the insured.[6] *See* Paul Holt Drilling, Inc. v. Liberty

---

[4]*The Tenth Circuit held in Brunswick Corp. that passing off does not require intent to deceive, but rather "requires the same standards of proof as does an action under Section 43(a) of the Lanham Act." Brunswick, 832 F.2d at 527 & n.8.*

[5]*In its diagram setting out TOD's various claims and recoverable damages, American Modern shows that TOD might be able to recover treble damages for nonintentional/negligent federal trademark infringement. Doc. #69, p. 28.*

[6]*The no suit provisions in the cases American Modern cited in footnote 5, Hayes v. State Farm Fire & Cas. Co., 855 F. Supp. 2d 1291, 1299 (W.D. Okla. 2012) and Caton v. State Farm Fire & Cas. Co., 2007 WL 2993869, at \*5 (W.D. Okla. Sept. 19, 2007) are not similar to the no action clause in the insurance contract under consideration here.*

Mut. Ins. Co., 664 F.2d 252, 254 (10th Cir. 1981) ("We think the Oklahoma court would hold the no action clause is intended to apply only to claims made by third parties.").

The court concludes plaintiffs have presented sufficient evidence to demonstrate that a fact question exists as to whether there was coverage for the $275,000 Mr. Trotter paid to settle the case. In other words, there is a fact question as to whether American Modern breached the insurance contract by failing to pay the entire $550,000 settlement amount.[7]

Bad Faith

"Under Oklahoma law,[8] an insurer has an 'implied-in-law duty to act in good faith and deal fairly with the insured to ensure that the policy benefits are received.'" Automax Hyundai S., L.L.C. v. Zurich Am. Ins. Co., 720 F.3d 798, 810 (10th Cir. 2013) (quoting Gray v. Holman, 909 P.2d 776, 780 n. 9 (Okla.1995)). In Badillo v. Mid Century Ins. Co.,121 P.3d 1080 (Okla. 2005) the Oklahoma Supreme Court clarified the level of culpability necessary for an insurer to be held liable for breach of the duty of good faith and fair dealing "in relation to the handling of a third-party claim made against the insured." *Id.* at 1094. It is "more than simple negligence, but less than the reckless conduct necessary to sanction a

---

[7]*Defendant also argues that equity precludes plaintiffs from recovering. The court is not persuaded that, based on Gay & Taylor, Inc. v. St. Paul Fire & Marine Ins. Co., 550 F. Supp. 710, 717 (W.D. Okla. 1981), it "can decide that the parties intended to share the costs of the settlement equally." Doc. #69, p. 42. Gay was tried to the court. A jury will "disentangle the facts relevant" to plaintiffs' claims in this case. Automax Hyundai S., L.L.C. v. Zurich Am. Ins. Co., 720 F.3d 798, 807 (10th Cir. 2013).*

[8]*This is a diversity action, governed by Oklahoma law. See Automax Hyundai, 720 F.3d at 804.*

punitive damage award against said insurer." *Id*. "A central issue in any analysis to determine whether breach has occurred is gauging whether the insurer had a good faith belief in some justifiable reason for the actions it took or omitted to take that are claimed violative of the duty of good faith and fair dealing." *Id.* at 1093-94.[9] *See* Milroy v. Allstate Ins. Co., 151 P.3d 922, 928 (Okla.Civ.App.2006) (affirming summary judgment on bad faith claim where, among other things, "[t]he record reveal[ed] that Allstate legitimately disputed the alleged value of [the third party's] claim").

Although plaintiffs' bad faith claim is based primarily on American Modern's conduct at and after the settlement conference, they also argue that the insurer's pre-conference conduct breached the duty of good faith an insurer owes its insured.

Plaintiffs initially contend that defendant improperly breached the "Chinese Wall" that was erected to avoid a potential conflict of interest between the insured and insurer. Because plaintiffs' insurance claim presented potential coverage issues, American Modern split plaintiffs' file, assigning adjuster Linda Wood initially, and then Ressie Ragland, to handle Trotter's defense and Connie Rockett, and later Jared Lamb, to be responsible for coverage issues. Plaintiffs assert that the "defense and coverage sides repeatedly and improperly communicated in a manner adverse to its insureds' 'best interests.'" Doc. #72, p. 9. Plaintiffs do not, though, offer evidence from which a reasonable juror could conclude

---

[9]*Badillo is otherwise distinguishable from this case, as there the adjuster "knew or should have known the claim against insured was one of probable liability . . . and that it was pretty much certain [the third party claimant's] damages greatly exceeded the $10,000.00 policy limits." Badillo, 121 P.3d at 1089.*

that the alleged improper communications affected the insurer's handling of the case. Plaintiffs point to Ms. Wood's inquiry to Ms. Rockett early in the case as to whether the cybersquatting claim was covered, but offers no evidence showing how, because of the response Ms. Woods received, the defense of the case was hampered in any respect.

Trotter Doors contends American Modern also crossed the line when, prior to the mediation, individuals on the coverage side "discussed at length strategies going into Monday's mediation," Doc. 72-4, p. 84, Woods had a conversation with unidentified persons and it was determined that "someone representing coverage [would] attend the mediation to drive home that many aspects of the case are not covered," Doc. #74-2, p. 62, and coverage counsel was sent to the mediation. However, plaintiffs submit no evidence that Mr. Trotter was aware that the attorney who appeared was from the coverage, rather than the defense side, of the claim file, or that he stated or did anything to prejudice the defense. In their brief plaintiffs do not fault American Modern for not settling the case at the mediation, but focus on its refusal to pay more than $275,000 at the subsequent settlement conference. As plaintiffs admitted, "[u]ntil the Branding Terms were resolved," which essentially occurred at the mediation, "there could be no discussion of a monetary settlement in which American Modern could contribute." Doc. #69, pp. 11-12 (Fact #33).

Woods testified that the file is split: "[s]o that I can make decisions that are in best interest of the insured to defend it, not – I don't defend, you know, one count differently than – more vigorously defend Count 1 than I defend Count 2 because it's not covered. So it's so that there's no – I defend the whole thing." Doc. #72-2, p. 4. Plaintiffs do not allege or

8

offer any evidence that American Modern provided only a partial defense or that it defended only covered claims. It was not really until the settlement conference that plaintiffs became dissatisfied with the way American Modern was handling their defense.

The remaining pre-settlement conference conduct which plaintiffs cite as evidence of bad faith consists of the reservation of rights letter American Modern sent Mr. Trotter a few days before the conference and shortly before the scheduled trial. Plaintiffs assert that it was the first time American Modern had informed Mr. Trotter that any of the money damages were not covered. They also point to language in the letter informing Mr. Trotter of his potential excess exposure for $2.75 million and the timing of the letter, all of which, defense attorney stated, scared and unnerved him.

Although Mr. Trotter asserts he had not been informed previously about which claims were covered under the policy, his attorney testified that he had had "discussions about the cybersquatting frequently" with Mr. Trotter because of the opinion letters.[10] Doc. #72-5, p. 9. *See also id.* at p. 10. In its initial, February 27, 2012, reservation of rights letter, American Modern provided Mr. Trotter with notice of the policy exclusions it was relying on. There was no question but that willful trademark infringement would fall within the provision which excluded coverage for personal and advertising injury "[c]aused by or at the direction of the insured with the knowledge that the act would violate the rights of another

---

[10]Counsel stated: "If he had been hit with [the] exceptional case, absolutely." Doc. #72-5, p. 9. *In other words, if Mr. Trotter had been found to have acted with a bad faith intent, required to commit cybersquatting, the policy would not have provided coverage.*

9

and would inflict 'personal and advertising injury.'" Doc. #72-4, p. 54. Mr. Ozinga knew there would be no coverage "if it was an exceptional case, if it was found like [Trotter] was intentionally doing something." Doc. #72-5, p. 8. However, he was confident that "there's no way that could happen," because "[i]t's his last name." *Id.*[11]

As for the $2.75 million amount cited, the letter stated that was plaintiffs' expert's estimation of plaintiffs' damages resulting from the alleged trademark infringement. And as for the timing of the letter, that alone is not enough, in the absence of other evidence, to create an inference of bad faith. Such reservation of rights letters are commonplace. That was why the letter did not concern plaintiffs' counsel, who testified that he understood why it was sent, stating that "[i]t's something we [attorneys] just take for granted." Doc. 72-5, p. 7.

The crux of plaintiffs' bad faith claim is American Modern's failure to fund the entire $550,000 settlement amount at the October settlement conference. The problem with plaintiffs' claim is that, in determining how much it would offer to settle, American Modern relied on the value given the case by the attorney who had been hired by plaintiffs. Mr. Ozinga testified that his opinion, which he repeatedly provided to American Modern, remained the same throughout the litigation. And his opinion was that the verdict in the case

---

[11]*Plaintiffs are being somewhat disingenuous when they assert that coverage representatives "planned with defense on coverage issues" but "secreted the same from Mr. Trotter until just before the settlement conference." Doc. #72, p. 34. Mr. Trotter was not proceeding pro se in the litigation and his attorney's communications with Linda Woods' reflected that it was Mr. Trotter's concerns about TOD's potential recovery on noncovered claims that scared him. See Doc. #72-4, p. 61 (Woods' claim file, 8/23/13 3:22:41 PM entry).*

10

for all claims, covered and noncovered, was going to be less than $100,000. Doc. #69-9, p. 123.

After the August 19, 2013, mediation, Linda Wood asked Ozinga if the following accurately summarized their conversations about the case: "Even though the plaintiff will be able to put up around 5 million, it's doubtful a jury will see this as anything more than a family squabble and we expect very little, if any, money will change hands. It seems unlikely that there will be an award greater than 100k." Doc. #72-4, 40. Ozinga responded: "That is essentially my opinion as the case stands today. Once again, my client does want to settle as previously discussed regardless of my opinion – which is understandable when you are looking at a potential million dollar claim by the plaintiff." *Id*. at p. 41. Ozinga's demands that American Modern settle the case were not based on any reevaluation he did but on "what the client wanted to do." Doc. 69-9, p. 72.[12] Woods testified that American Modern "relied very heavily on Mr. Ozinga in the case, very, very heavily. He was the insured's attorney." Doc. #69-12, p. 21.

Plaintiffs have not offered evidence demonstrating it was inappropriate or unreasonable for American Modern to depend, when making settlement decisions, on the opinion of the attorney who had been handling the case from the beginning.[13] *See* Garnett

---

[12]*Mr. Ozinga stated that "if my client wants to settle it, that's not an unreasonable amount if its within the policy limits." Doc. #69-9, p. 53.*

[13]*While Jennifer Miller, who was an attorney working with Mr. Ozinga, may have had concerns about Mr. Trotter's exposure, the communications with American Modern were generally through Mr. Ozinga. Doc. #72-8, p. 10.*

v. Gov't Emps. Ins. Co., 186 P.3d 935, 944 (Okla.2008) ("The essence of the tort is the unreasonable, bad-faith conduct of the insurer. A central issue is whether the insurer had a good faith belief in some justifiable reason for the actions it took or omitted to take . . . ."). Against the backdrop of Mr. Ozinga repeatedly telling American Modern that the verdict value was less than $100,000, no rational juror could conclude that American Modern's offer to settle the case for almost three times what Mr. Ozinga had said it was worth was unreasonable. *See* Magnum Foods, Inc. v. Continental Cas. Co., 36 F.3d 1491, 1507 (10th Cir. 1994) (evidence supporting a reasonable inference that insurer acted in bad faith included claim adjuster's recommendation that assault (rape) claim against insured be treated as "merely a sex discrimination case for settlement purposes," despite his estimation of "only a 55% chance of securing a defense verdict" in the underlying case brought against the insured, and the fact that the "senior claims analyst who evaluated the plaintiffs' claim to determine what amount to offer at the court-ordered mediation only received the file the day before, which gave her a short time in which to make her evaluation).

Even though Mr. Ozinga's $100,000 case valuation of a possible jury verdict did <u>not</u> distinguish between covered and noncovered claims, Doc. #69-9, p. 81, American Modern also could consider which claims were covered by the insurance policy when determining the amount it was willing to offer in settlement. This is a critical fact which plaintiffs ignore. An insurer's duty to settle applies only to covered claims. *See* 3 New Appleman on Insurance Law § 23.02[6][c] (Library Edition 2015); *see also* Magnum Foods, 36 F.3d at 1506 (duty of good faith held not to require insurer to settle or contribute to the settlement

of an uninsurable punitive damages claim).[14] "If the suit includes both covered and noncovered claims, the insurer need contribute no more than the fair settlement value of the covered claims." 3 New Appleman on Insurance Law § 23.02[6][c].

One key concern was TOD's ability to recover attorney's fees from Trotter Doors. When specifically asked by American Modern whether TOD could recover fees and "under which counts," Mr. Ozinga advised the insurer that it could "potentially get fees under the federal trademark infringement count and the Oklahoma unfair competition count, but not on the Cybersquatting." Doc. #72-4, p. 41. However, Mr. Ozinga stated that, "[t]o get fees in an infringement case, the standard is if the infringement was 'exceptional.' This usually/essentially means willful infringement coupled with bad faith conduct." *Id*.

American Modern had been advised by Mr. Ozinga that the jury verdict should not exceed $100,000 and that an attorney's fees award was unlikely but, if it occurred, would only occur if the infringement was willful and thus fell within the policy exclusion. Under these circumstances, plaintiffs have not created a fact question as to whether American Modern's decision to limit its contribution to the settlement to $275,000, even though it was below the policy limits, was unreasonable. *See* Magnum Foods, Inc. v. Cont'l Cas. Co., 36 F.3d 1491, 1508 (10th Cir. 1994) ("If an insurer fails to act cooperatively to reach a

---

[14]*Because the insurer does not have to contribute to the settlement of noncovered claims, there has to be some communication between individuals handling the defense and coverage sides of a split file. As explained by Ms. Rockett, the person handling the insured's defense needs to know about coverage because "when they are going to come up with a settlement number, if there's no coverage for a particular allegation,...[American Modern] shouldn't be offering to cover that particular allegation." Doc. #72-1, pp. 4-5. The Chinese wall is not impenetrable.*

settlement—for example, by refusing to make a reasonable offer to settle at least the insured portion of the claim—then the insurer's conduct may be reasonably perceived as tortious, and the trial court may submit the issue of bad faith to the jury.").

In reaching this decision the court has considered the behavior of Ms. Woods, the insurance adjuster, at the settlement conference. There if no evidence that she "hammered" Mr. Trotter into contributing his own money to settle the case.[15] While she did refuse to contribute more when the parties reached an impasse, Mr. Trotter admitted American Modern did not force him to pay the $275,000. Doc. #69-2, p. 67. Mr. Trotter simply felt he "had no other resolution." *Id*. The evidence as to Mr. Trotter's payment may well create a fact question as to whether the payment was "voluntary" within the meaning of the voluntary payment provision of the insurance contract, but it is insufficient to support an inference of bad faith.[16]

However, while the insurer's conduct did not cross the bounds of reasonableness at

---

[15]*The statements of Mr. Sensibar, Linda Woods' superior, as to what he believed constituted permissible conduct by an insurer towards its insured to get the insured to contribute to a settlement within policy limits do not affect the resolution of the bad faith issue. Mr. Sensibar was not present at the settlement conference and there is no evidence that Ms. Woods told Mr. Trotter at the conference to get him to contribute to the settlement that he was "potentially going to get hit for either an excess verdict or uncovered damages if he [went] to trial." See Doc. 72-6, p. 4.*

[16]*Mr. Trotter and Trotter Doors do not dispute that the voluntary payments provision could apply in a situation where both the insured and insurer contribute to a settlement. They argue only that Mr. Trotter's payment was not "voluntary," as the term is used in the contract provision. While plaintiffs rely heavily on* Traders & Gen. Ins. Co. v. Rudco Oil & Gas Co., *129 F.2d 621 (10th Cir. 1942) to support their position that American Modern cannot invoke the voluntary payment clause, that case is clearly distinguishable. The insurer "refused to agree to the settlements, or to participate therein," and the coverage in that case was "plain" and insured's liability "patent." Id. at 624, 628.*

the settlement conference, the court concludes a question of fact does exist as to whether its conduct afterwards amounted to bad faith.

At the settlement conference the parties did not reach an agreement that Trotter Doors would release its indemnity claim against American Modern. So far as appears from the parties' current submissions, the issue was not discussed. Ms. Woods simply assumed Mr. Trotter agreed to a release but admitted she "did not tell him he had to sign a policy release." Doc. #72-2, p. 18. The settlement agreement does not mention a release of any type. Doc. #69-33. Nonetheless, American Modern subsequently indicated it would withhold payment of its portion of the settlement payment unless the agreement included language in which Mr. Trotter and Trotter Doors released <u>any</u> claims, including a bad faith claim, they might have against American Modern under Policy # Q61020359 or related to the TOD lawsuit. Doc. #72-4. pp. 93-94. This evidence supports an inference that, motivated at least partially by the "bad faith implication letter from plaintiff sent . . . by insured's counsel," Doc. #72-9. p. 1,[17] the insurer threatened to upend a hard wrought settlement.

American Modern responds that counsel for TOD and Trotter Doors negotiated the settlement agreement after the settlement conference, but excluded it from the negotiations. However, the evidence American Modern submitted does not demonstrate that Mr. Ozinga or anyone else precluded it from participating in the negotiation process, particularly since

---

[17]*Under Oklahoma's Unfair Claim Settlement Practices Act, it is an unfair claim settlement practice to "[r]equest[] a claimant to sign a release that extends beyond the subject matter that gave rise to the claim payment." 36 Okla. Stat. § 1250.5(8).*

American Modern was sent draft copies of the settlement agreement. *See* Doc. #72-4, pp. 14-18, p. 58. There is no indication in the record that American Modern believed it should have been included in the drafting process until Ms. Potash sent Mr. Ozinga and TOD's counsel her November 20, 2016, email, after TOD had signed the settlement agreement. *See* Doc. # 72-4, pp. 12, 93-94. The court concludes American Modern's conduct in conjunction with its attempt to obtain a release creates a fact question precluding summary judgment on plaintiffs' bad faith claim.

The court has concluded that plaintiffs have presented sufficient evidence to demonstrate that fact questions exist as to whether American Modern breached the insurance contract by failing to pay the entire $550,000 settlement amount and as to whether it then committed bad faith by conditioning its payment of the amount it agreed to pay on Brenton Trotter and Trotter Doors' execution of a complete release that they had not previously agreed to execute. Accordingly, defendant's motion for summary judgment [Doc. #69] is denied.

**IT IS SO ORDERED**.

Dated this 14th day of November, 2016.

JOE HEATON
CHIEF U.S. DISTRICT JUDGE